<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| P.J., <br><br> Plaintiff, <br><br> v. <br><br> CITY OF JERSEY CITY, et al. <br><br> Defendants. | Civil Action No. 21-20222 (EP) (CLW) <br><br> **OPINION** |

**PADIN, District Judge.**

Plaintiff P.J. alleges that in 1972, when he was 8 years old, Defendant "P.O.," a Jersey City Police Officer (the "Officer") raped him. Plaintiff sued both the Officer, identified in the Amended Complaint only as "P.O.," and Jersey City. Jersey City moves to dismiss, arguing that it cannot be held vicariously liable as an employer for the Officer's criminal conduct. For the reasons below, the Court will **DENY** the motion.

**I.     BACKGROUND[1]**

In August 1973, Plaintiff was eight years old and lived in Jersey City.[2] Compl. ¶¶ 14-16. Plaintiff, who was with his friends, kicked a piece of cardboard into the street. *Id.* ¶¶ 17-19. The Officer, wearing a Jersey City police uniform and badge, carrying a gun and handcuffs, and driving a police car approached Plaintiff. *Id.* ¶¶ 17-19. Plaintiff, having seen the Officer patrolling the area before, recognized him as the neighborhood "beat cop." *Id.* ¶ 16.

---

[1] These facts come from D.E. 14, the Amended Complaint ("Compl."), accepted as true for the purposes of this motion.
[2] Plaintiff now resides in New York which, together with the prayer for relief above $75,000, appears to establish diversity jurisdiction. Amended Complaint ¶¶ 3, 10.

The Officer told Plaintiff that Plaintiff had broken the law and threatened to arrest Plaintiff's parents unless Plaintiff met him in a nearby vacant lot the next day. *Id.* ¶ 21. Plaintiff, terrified that the Officer was telling the truth and hesitant to challenge the individual's authority, complied and showed up at the lot the next day. *Id.* ¶¶ 21-25. The Officer arrived in a Jersey City police car, again dressed in a Jersey City police uniform, wearing a badge, and carrying a gun and handcuffs. *Id.* ¶ 26. The Officer raped Plaintiff, causing physical and ongoing psychological injuries. *Id.* ¶¶ 28-29.

Plaintiff filed his original complaint on November 29, 2021. D.E. 1.[3] Following Jersey City's motion to dismiss, Plaintiff filed the Amended Complaint. The Amended Complaint alleges four counts. The first three are against the Officer: Count I alleges sexual battery, Count II alleges violation of the New Jersey Child Sexual Abuse Act, N.J.S.A. 2A:61B-1, *et seq.*, and Count III alleges fraudulent misrepresentation. *Id.* ¶¶ 33-71.

Finally, Count IV alleges vicarious liability against Jersey City. Jersey City now moves to dismiss that count pursuant to Fed. R. Civ. P. 12(b)(6), arguing that Count IV fails to state a claim. D.E. 14. Plaintiff opposes. D.E. 19.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. However, the allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Twombly*, 550 U.S. at 570; *see also West Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That standard is met "when the plaintiff pleads factual content that allows the court to draw

---

[3] Though this action may once have been barred by the statute of limitations, the New Jersey state legislature passed Bills S477 and A3648, which extended the statute of limitations for a two-year filing period. N.J.S.A. 2A:14-2b. Jersey City does not challenge the action's timeliness.

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' ... it asks for more than a sheer possibility." *Id.*

Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. As the moving party, the defendant bears the burden of showing that no claim has been stated. *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of the motion, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

## III. DISCUSSION

The Court's inquiry is limited: whether Plaintiff's well-pled factual allegations plausibly assert a claim for relief. The central dispute is whether Plaintiff has plausibly stated an exception to the general rule that an employer (Jersey City) is not liable for its employee's (the Officer) conduct.

### A. An employer is not generally held vicariously liable for its employee's actions outside the scope of employment

As a federal court sitting in diversity, this Court must "apply the substantive law of the state whose laws govern the action." *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 91 (3d Cir. 2008). Here, the parties agree that the Court must apply New Jersey law, although for the reasons below, the Court will also look to other jurisdictions.

The common-law doctrine of *respondeat superior* generally holds that an employer may be liable for the "torts of one of its employees only when the latter was acting within the scope of his or her employment." *Di Cosala v. Kay*, 91 N.J. 159, 168 (1982) (citing *Gilborges v. Wallace*, 78 N.J. 342, (1978); *accord Singer v. Beach Trading Co.*, 876 A.2d 885, 893 (N.J. Super Ct. App.

3

Div. 2005). Under New Jersey law, "[c]onduct is generally considered to be within the scope of employment if, 'it is of the kind [that the servant] is employed to perform; it occurs substantially within the authorized time and space limits; [and] it is actuated, at least in part, by a purpose to serve the master.'" *Di Cosala*, 91 N.J. at 168 (quoting Restatement (Second) of Agency ("Restatement 2d") § 228); *Rodriguez v. Zeigler*, No. A-0591-16T3, 2018 WL 3130959, at *2 (N.J. Super. Ct. App. Div. June 27, 2018); *accord Carter v. Reynolds*, 815 A.2d 460, 465-66 (N.J. 2003). "Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Carter*, 815 A.2d at 465 (quoting Restatement 2d § 228(b)).

Though "an act may be within the scope of employment although consciously criminal or tortious," *Davis v. Devereux Found*., 209 N.J. 269, 303 (2012), there is no dispute here that the Officer's actions were clearly outside the scope of employment. *See D.T. v. Hunterdon Med. Ctr.*, No. A-2441-10T2, 2012 WL 4448774, at *5 (N.J. Super. Ct. App. Div. Sept. 27, 2012) ("Manifestly, [employee's] sexual acts with [minor co-worker] had no relationship to his position as a transport aide at the hospital and were never undertaken with any reference to his employment," and therefore outside the scope of employment).

### B. The Restatement's exceptions to the general vicarious liability rule

Plaintiff's vicarious liability argument relies upon Restatement 2d § 219(2), which provides, as relevant here, that:

> A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless…
>
> (c) The conduct violated a non-delegable duty of the master, or
> (d) The servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation."

4

Phrased differently, § 219(2)(c) imputes liability to an employer for an employee's acts outside the scope of employment when the employer owed a non-delegable duty to the tortfeasor's victim. And § 219(2)(d) imputes liability in two situations. The first is "apparent authority," which may "be the basis of an action of deceit, and even physical harm," as "where one purports to speak for his employer in defaming another or interfering with another's business." Rest. 2d § 219 cmt. e. The second is the "aided-by-agency" exception, where "the servant may be able to cause harm because of his position as agent, as where a telegraph operator sends false messages purporting to come from third persons [or a store] manager…is enabled to cheat the [owner's] customers because of his position." *Id.*

A federal court's task is normally to predict how the New Jersey Supreme Court would rule if deciding the case. *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 91-92 (3d Cir. 2008). But there are no New Jersey Supreme Court cases precisely addressing whether these facts fall within Restatement 2d §§ 219(2)(c) and (d). *K.J. v. J.P.D.*, No. 1:20-CV-14177, 2022 WL 4596717, at *12 (D.N.J. Sept. 30, 2022). And in that situation, courts must "look to decisions of state intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that have addressed the issue," as well as to "analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Norfolk*, 512 F.3d at 91.

1. **Restatement 2d Section 219(2)(c): there is no non-delegable duty**

Under § 219(2)(c), Plaintiff argues that Jersey City had a non-delegable duty to protect children, and violated that non-delegable duty when it permitted an officer to abuse his authority. Plaintiff has not adequately demonstrated, however, that such a duty is (or would be) recognized by New Jersey courts.

Restatement 2d § 214 defines the "non-delegable duty" of a principal for the acts of its agent as follows:

> A master or other principal who is under a duty to provide protection for or have care used to protect others and who confides the performance of such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty.

The duty diverges from traditional, "scope of employment" liability because it derives from the relationship between the employer and the person to whom the duty is owed based on its extraordinary importance to the public. *Davis*, 209 N.J. at 289. For that reason, the duty is quite broad—an employer's exercise of reasonable care alone cannot satisfy it. *Id.* Or phrased differently, "[o]nce an employee has committed a tortious act, the duty would effectively impose absolute liability upon" employer, … represent[ing] a significant expansion of New Jersey tort law[.]" *Id.* at 289.

Plaintiff's theory—a general duty of care by Jersey City to Plaintiff (and perhaps all children)—is unsupported. As Jersey City highlights, the New Jersey Supreme Court has rejected the non-delegable duty doctrine in situations involving greater control and authority than the situation here. In *Davis,* the Court declined to extend the doctrine to a residential facility where the facility's employee intentionally burned with scalding water a resident with severe autism and developmental disabilities. 209 N.J. at 302

There is likewise no general basis, as Plaintiff urges, to impute any general non-delegable duty to Jersey City to protect its citizens based on its police powers. "[A] state's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause" absent a special relationship between the state and the victim. *DeShaney by First v. Winnebago County Department of Social Services,* 489 U.S. 189, 197 (1989) (declining to impose

a duty upon a state to protect the life, liberty or property of a citizen from deprivations by private actors absent the existence of a special relationship).

A "special relationship" generally requires a state's affirmative act. For example, "[a] relationship between the state and foster children arises out of the state's affirmative act in finding the children and placing them with state-approved families because the state has assumed "an important continuing, if not immediate, responsibility for the child's well-being." *Nicini v. Morra,* 212 F.3d 798, 807-08 (3d Cir. 2000). The Third Circuit has read *Deshaney* as primarily setting out a test of physical custody. *Philadelphia Police & Fire Ass'n for Handicapped Children, Inc. v. City of Philadelphia,* 874 F.2d 156, 167 (3d Cir. 1989) ("the state continues to owe an affirmative duty to protect those physically in its custody"); *see also, Fialowski v. Greenwich Home for Children, Inc.,* 921 F.2d 459 (3d Cir. 1990) (no duty of care for mentally impaired adult voluntarily placed at institution because state has not substantially curtailed his freedom).

Thus, a special relationship—and therefore a non-delegable duty—exist between the state and the incarcerated or involuntarily committed, who are "placed ... in a custodial environment ... [and are] unable to seek alternative living arrangements." *Nicini,* 212 F.3d at 808 (citing *Taylor v. Ledbetter,* 818 F.2d 791, 795 (11th Cir. 1987) (*en banc*)). Conversely, where individuals "retain substantial freedom to act," no special relationship will be found. *D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1373 (3d Cir. 1992) (citing *J.O. v. Alton Community Unit School Dist. 11,* 909 F.2d 267 (7th Cir. 1990)). Thus, "compulsory attendance laws did not liken school children to prisoners and the involuntarily committed, both of whom are unable to provide for their own basic human needs." *Id.* ("Schoolchildren, like the institutionalized, may complain to officials, however, unlike prisoners and mental patients, they may also turn on a daily basis to others such as their parents for help.").

Cases cited by Plaintiff can be distinguished because they all involve arrest, incarceration, or some other physical restraint on the victim's freedom to act—factors not present here. For example, in *Sherman v. State Dep't of Pub. Safety*, in which the Delaware Supreme Court identified a non-delegable duty to "safeguard *the arrestee* from harm *while she was under arrest*." 190 A.3d 148, 154 (Del. 2018) (emphasis added) (cited by Pl. Opp. 36). In the child abuse context, Plaintiff's cited cases involve situations in which a defendant was acting *in loco parentis* (in the place of a parent), and thus "in the best position to know of the abuse and stop it." *Hardwicke v. Am. Boychoir Sch.*, 188 N.J. 69, 101 (2006) (finding violation of non-delegable duty where victim was boarding school student); *see also J.H. v. Mercer Cnty. Youth Det. Ctr.*, 396 N.J. Super. 1, 18 (App. Div. 2007) (finding non-delegable duty of juvenile detention center to protect "juveniles entrusted to its care from sexual abuse at the hands of employees granted supervisory authority over them").[4]

Thus, New Jersey has not recognized, and likely will not recognize, any general non-delegable duty by Jersey City to protect Plaintiff, and thus Restatement § 219(2)(c) does not apply. That is not to say, however, that Plaintiff's other arguments are not viable.

**2.  Restatement Section 219(2)(d): Aided-by-agency and apparent authority**

Under Restatement § 219(2)(d), Plaintiff pleads that Plaintiff's attacker "was aided in accomplishing his intentional torts (sexual battery) against Plaintiff by the existence of the agency relationship" with Jersey City. ¶¶ 85-87, 106-141. Plaintiff alleges, in other words that the Officer's role and/or authority as a police officer, conferred upon him by the City, facilitated the

---

[4] In *Davis*, the New Jersey Supreme Court clarified that *J.H.*'s invocation of a "'non-delegable' common-law duty" misconstrued earlier decisions which addressed Restatement § 219(2)(d), not (c). 209 N.J. at 292, n.5. Section (d) is addressed below.

rape and cover-up by placing him in a position to make believable threats to arrest Plaintiff and his parents.  Amended Complaint ¶¶ 105-111.

Restatement 2d § 219(2)(d) imposes liability for acts outside the scope of employment where "the [employee] purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation."  Each clause is treated as a distinct exception.

### a. Aided-by-agency: Plaintiff has adequately alleged that the Officer's actions were aided by his role as a Jersey City police officer

Some courts have applied the aided-by-agency theory literally.  *See Costos v. Coconut Island Corp.*, 137 F.3d 46, 50 (1st Cir. 1998) (applying aided-by-agency theory where hotel's manager, by virtue of his agency relationship with the hotel, was entrusted with keys to all rooms and locations, and used the key and knowledge of plaintiff's stay to unlock the door and rape plaintiff).  The same year as *Costos*, the Supreme Court applied it to Title VII workplace-harassment claims.  *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998) (Kennedy, J.); *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998) (Souter, J.).

Still, many courts, in addition to dissenters from opinions adopting the aided-by-agency theory, have criticized this theory as an expansion of liability better suited to legislatures.  *See, e.g., Hamed v. Wayne Cnty.*, 490 Mich. 1, 29 (2011) (rejecting aided-by-agency theory where officer arrested and sexually assaulted a detainee in jail).  Those opinions expressed several concerns.  The most common is that "§ 219(2)(d) is phrased so vaguely and devoid of any limiting principles that it would be an exception so broad as to swallow the rule."  *Pearce v. Werner Enterprises, Inc.*, 116 F. Supp. 3d 948, 955-56 (D. Neb. 2015) (citing *Zsigo*, 475 Mich. at 226-29); *see also E.S. for G.S. v. Brunswick Inv. Ltd. P'ship*, 469 N.J. Super. 279, 300 (App. Div. 2021) ("without principled limitations, § 219(2)(d) could 'swallow[ ] the general rule that respondeat

9

superior does not attach to intentional torts' and render employers strictly liable for their employees' private misconduct that occurs outside of the employee's scope of employment.").

One court illustrated the theory's "obvious defect":

> it comes close to creating strict vicarious liability for employers, and, despite purporting to be an exception, it nearly swallows the general rule that respondeat superior does not attach to intentional torts. [R]ead literally, a creative plaintiff's lawyer could make a colorable argument for vicarious liability in almost every intentional tort case in which the tortfeasor happens to be gainfully employed. If a barista poisoned a patron's coffee, the patron could sue the coffee shop under the theory that the barista was only able to commit the tort because he or she worked for the coffee shop. If a utility worker used his uniform and credentials to get invited into a woman's home, and then proceeded to sexually assault the woman, the utility worker's agency relationship with the utility company could be said to have aided him in his sexual assault. If a drive-by shooting was committed using a company car or a police department—or security company-issued gun, then the plaintiff could name the issuing employer. Most open-endedly of all, a plaintiff might even be able to name a tortfeasor's employer in a drive-by shooting, even if the employer issued neither the gun nor the car, if the tortfeasor bought the gun or the car using his or her salary—which, after all, he or she obtained by virtue of the employment (*i.e.,* agency) relationship.

*Pena v. Greffet*, 110 F. Supp. 3d 1103, 1118 (D.N.M. 2015).

Jersey City cites these critiques, noting that New Jersey is not among the few jurisdictions which have expanded vicarious liability to police officers. Jersey City Br. 21. But that is beside the point. Upon a motion to dismiss, the Court need only determine whether Plaintiff has stated a plausible claim; in other words, whether the New Jersey Supreme Court might, confronted with these facts, join those other jurisdictions. Because this Court finds that it would, the motion to dismiss will be denied.

The New Jersey Supreme Court has "adopted [Restatement §] 219 as the framework for evaluating employer liability in hostile environment sexual harassment claims" brought under the New Jersey Law Against Discrimination ("LAD"). *Hardwicke v. Am. Boychoir Sch.*, 188 N.J. 69, 101 (2006) (citing *Lehmann v. Toys R Us, Inc.*, 132 N.J. 587, 619-20 (1993) ("[I]f an employer

delegates the authority to control the work environment to a supervisor and that supervisor abuses that delegated authority, then vicarious liability under § 219(2)(d) will follow."). The New Jersey Supreme Court subsequently extended the *Lehmann* holding to Conscientious Employee Protection Act (CEPA) claims, holding that "[b]oth CEPA and LAD effectuate important public policies[:] overcom[ing] the victimization of employees and to protect those who are especially vulnerable in the workplace from the improper or unlawful exercise of authority by employers." *Hardwicke*, 188 N.J. at 102 (citing *Abbamont v. Piscataway Twp. Bd. of Educ.*, 138 N.J. 405, 417 (1994)). In *Hardwicke*, the New Jersey Supreme Court applied the aided-by-agency exception to protect children from abuse by those *in loco parentis,* holding that a boarding school could be held liable for the intentional acts of its employee outside of the scope of employment—there, like here, sexually abusing a minor.  188 N.J. 69.

But the New Jersey Supreme Court "has never applied the aided-by-agency exception…in any circumstance other than those remedial statutes designed to eradicate workplace discrimination and harassment, to protect conscientious employees, or to protect children from abuse by those *in loco parentis*," none of which precisely encompass the situation here. *Brunswick*, 469 N.J. Super. at 302.

Courts that *have* adopted the aided-by-agency theory have interpreted it narrowly and sparingly.  Where employed, the common thread is the unique power of the employee over a victim.  *See Ayuluk v. Red Oaks Assisted Living, Inc.,* 201 P.3d 1183, 1200 (Alaska 2009) (finding that a "caregiver in an assisted living home who has supervisory power or authority over vulnerable residents is…in a position that is analogous to that of a supervisor[.] …While the [caregiver's] sexual advances themselves may neither be authorized nor reasonably appear to be authorized by

11

the employer, the caregiver's power that enables him to further his improper conduct is an inherent part of the employment relationship").

Unsurprisingly, these considerations sharpen in a law enforcement context. "What makes [such circumstances] virtually unique from a policy perspective is the extraordinary power that a law enforcement officer has over a citizen." *Doe v. Forrest*, 2004 VT 37, ¶ 34 (2004). "[A]lmost uniformly, where excesses are committed by such officers, their employers are held to be responsible for their actions even though those actions may be somewhat removed from their usual duties. This is unquestionably the case because of the position of such officers in our society." *Id.* at 37, ¶ 35. As the *Brunswick* court recognized, "[o]ther jurisdictions that have applied the doctrine outside such situations have done so *only if the employee-tortfeasor was in a position to exercise unique power over the victim*." *Brunswick*, 469 N.J. Super. at 302 (emphasis added).

Other courts discussing this extraordinary power have found that "because of the substantial benefits that the community derives from the lawful exercise of police power," the cost "resulting from misuse of that power should be borne by the community." *Mary M. v. City of Los Angeles,* 54 Cal.3d 202 (1991) (*en banc*) (quoting *Policemen's Benev. Ass'n of N.J. v. Washington Tp.,* 850 F.2d 133, 141 (3d Cir. 1988) ("police officers [exercise] the most awesome and dangerous power that a democratic state possesses with respect to its residents—the power to use lawful force to arrest and detain them.")); *Applewhite v. City of Baton Rouge,* 380 So.2d 119, 121 (La.Ct.App. 1979) (finding apparent authority where officer who "was able to separate the plaintiff from her companions because of the force and authority of the position which he held."); *see also Mahar v. StoneWood Transp.,* 823 A.2d 540, 545-46 (Me. 2003) (finding that the theory was inapplicable where a truck driver driving his employer's truck committed an assault and drove in a threatening manner).

The Appellate Division, in *Brunswick*, cited favorably to three state supreme court decisions imputing liability to a municipality for sexual assault by its officer: *Sherman v. State Dep't of Pub. Safety*, 190 A.3d 148, 154-55 (Del. 2018) ("if a police officer makes a valid arrest and then uses that leverage to obtain sex from his arrestee, his misconduct need not fall within the scope of his employment ... to trigger his employer's liability" given "the unique, coercive authority entrusted in ... police[.]"), *Spurlock v. Townes*, 368 P.3d 1213, 1216-17 (N.M. 2016) (corrections officer), and *Forrest*, 853 A.2d at 60-67 (applying theory to sexual assault by a police officer, based in part on the "extraordinary power that a law enforcement officer has over a citizen").  Likewise, the Third Circuit recently cited favorably to both *Costos*, which imputes vicarious liability to an employer when an employee "take[s] advantage of some special mechanism afforded to him by his employment" and *Forrest*, which imputes vicarious liability when an employer "provided the employee a position of special authority making the victim particularly vulnerable to the wrongful act." *Yucis v. Sears Outlet Stores, LLC*, 813 F. App'x 780, 786 (3d Cir. 2020).

The City's central policy argument is that imputing vicarious liability would authorize a near-unlimited expansion of tort liability to police departments and other public service agencies. In other words, if liability is found, police departments might be forced to reduce or limit services. But this argument was considered and rejected by the courts adopting the aided-by-agency theory. As the *Sherman* court held, the concerns are mitigated by recent developments:

> police agencies are well positioned through careful hiring, training, and other practices to address the risk of sexual misconduct by their officers[,] …including training officers on the proper way to interact with the public, and efforts to monitor the time officers spend with arrestees to ensure that it is not suspiciously long.  With developments such as body cameras and other technologies providing both video and audio monitoring of police contact with the public, police agencies should, we hope, be even better positioned to deter and prevent sexual wrongdoing by police officers.

13

190 A.3d at 189.

And despite concerns expressed about the aided-by-agency's unrestrained expansion into other arenas and infringement upon the province of the legislature, it does not appear that those concerns were justified. Indeed, even the Vermont Supreme Court, which applied the theory in *Forrest*, rebuffed attempts to expand the agency exceptions beyond those boundaries. *See Doe v. Newbury Bible Church*, 182 Vt. 174, 198 (2007) (answering a certified question from the Second Circuit by determining that, under Vermont law, Section 219(2)(d) does not apply to "situation[s] involving tortious acts by a pastor"). Accordingly, Plaintiff has stated a claim for vicarious liability.

### b. Apparent authority

The second Restatement 2d § 219(2)(d) component is apparent authority. Under that theory, vicarious liability can also be imputed to an employer "upon conduct which is within the apparent authority of a servant, as where one purports to speak for his employer in defaming another or interfering with another's business. Apparent authority may also be the basis of an action of deceit, and even physical harm." Restatement 2d § 219, cmt. on subsection (2) (citations omitted).

There is substantial overlap between aided-in-agency and apparent authority. As one court put it, "if a tortfeasor uses his or her apparent authority to commit a tort that he or she could not have committed—or would have had a harder time committing—without the apparent authority, then the agency relationship aided the tortfeasor." *Pena*, 110 F. Supp. 3d at 1118.

But despite the overlap, the concepts remain distinct. And whereas courts have been more inclined to find liability where torts were "aided by agency," courts have been less inclined to find that the same agent had "apparent authority" to commit those torts. The *Brunswick* court, for

14

example, found that a property owner had authorized its employee to make repairs and perform maintenance, the "only authority that plaintiff and her family could have reasonably relied upon in permitting him access or otherwise not objecting to his access." 469 N.J. Super. at 305. Thus, "[t]o hold [the employer] vicariously liable for [the employee's rape], plaintiff was required to demonstrate that employer provided the employee with more than "merely the opportunity" to commit the crime. Likewise, even in *Forrest*, where the police officer who raped the plaintiff had "the ordinary trappings of police power—a gun, badge and uniform," the Vermont Supreme Court could not "conclude that it would be reasonable for plaintiff to infer such authority from the visible manifestations of Forrest's power as a law enforcement officer or his threats, if any, to use his power on plaintiff." 2004 VT at 37, ¶ 24.

That said, at this juncture, Plaintiff has asserted a plausible claim for two reasons. The first is that there is some authority suggesting that apparent authority may have a subjective component. For example, the *Pena* court found that although apparent authority

> requires an objectively reasonable perception that the agent was acting pursuant to the principal's orders[,] some attention should be paid to the level of sophistication and, frankly, desperation, typical among inmates, and how those factors affect their reasonable perception of a prison guard's authority. …In other words, "an inmate [singled out for attention] likely feels as if she is under the control of the guard himself."

110 F. Supp. 3d at 1135.

This could plausibly be compared to the situation here: the Officer used his authority as the "beat cop" in his neighborhood to separate Plaintiff, who reasonably believed that the Officer could (and would) arrest him or his family, from his companions to assault him.

And the second reason that Plaintiff's apparent authority claim survives is that the Restatement (Third) of Agency (2006) ("Restatement 3d") may apply to expand the apparent authority basis for liability. The American Law Institute Criticism considered criticism of the

15

aided-by-agency theory when it drafted the Restatement 3d.[5] The Restatement 3d's comments explain that the aided-by-agency exception was omitted as a distinct basis for vicarious liability in favor of a "more fully elaborated treatment of apparent authority and by the duty of reasonable care that a principal owes to third parties with whom it interacts through employees and other agents." Restatement 3d § 7.08 cmt. b. Section 7.08 provides that

> A principal is subject to vicarious liability for a tort committed by an agent in dealing or communicating with a third party on or purportedly on behalf of the principal when actions taken by the agent with apparent authority constitute the tort or enable the agent to conceal its commission.

But the apparent authority theory survived and, arguably, expanded slightly with the addition of the final clause: "or enable the agent to conceal [the tort's] commission." Here, Plaintiff has plausibly alleged that he believed that the Officer acted with apparent authority in ordering him to meet him the next day to facilitate the rape (by getting Plaintiff alone), or concealing it thereafter (the threat of arrest). Compl. ¶¶ 11-24; *Applewhite*, 380 So.2d at 121 (officer who raped the plaintiff was "able to separate the plaintiff from her companions because of the force and authority of the position which he held," as evidenced by the fact that he was "on duty in uniform and armed, and was operating a police unit at the time."). This provides another basis to deny the motion.

## C. Identification of "P.O."

Finally, Jersey City also seeks to have "P.O." (the Officer) renamed in the caption and Complaint because the "P.O." designation may cause a fact-finder (likely a jury) to assume that

---

[5] Jersey City argues that New Jersey has not adopted the Restatement (Third) of Agency (2006) ("3d Restatement"), and therefore that it does not apply here. Jersey City Br. 13, *et seq.*. This is a confusing, and perhaps self-defeating argument because, as Jersey City recognizes and as discussed here, the 3d Restatement narrows vicarious liability by removing the stronger aided-by-agency exception. In any event, it is unclear, at this juncture and based on the briefing before the Court, which Restatement would apply.

16

Plaintiff's assailant was, in fact, a Jersey City Police Officer. While Jersey City may be correct that the "P.O." designation may bias a jury, that determination is premature before any discovery has occurred, as this matter is still in its early phases. The matter is also insufficiently briefed—the only case cited by Jersey City is inapplicable. *See Tonka Corp. v. Rose Art Indus., Inc.*, 836 F. Supp. 200, 217 (D.N.J. 1993) (discussing the mechanism for striking affirmative defenses). Accordingly, that request will be denied without prejudice.

### IV. CONCLUSION

For the reasons above, Jersey City's motion is **DENIED**. An appropriate order follows.

Dated: 11/15/2022

      *Evelyn Padin*
      Evelyn Padin, U.S.D.J.